IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF RODNEY D. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF RODNEY D. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

RANDY D., APPELLANT, AND CHRISTINA T., APPELLEE.

Filed October 10, 2023.    No. A-23-143.

Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Brady J. Hoekstra, of M | F Law Omaha, for appellant.

Shinelle Pattavina, Deputy Douglas County Attorney, for appellee State of Nebraska.

BISHOP, ARTERBURN, and WELCH, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Randy D. appeals from an order of the separate juvenile court of Douglas County which terminated his parental rights to his minor child, Connor D. In the order, the juvenile court found that grounds existed for termination of Randy's parental rights pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016) and that the termination was in Connor's best interests. In addition, the juvenile court overruled Randy's motion for visitation pending appeal. In this appeal, Randy argues that the juvenile court erred in finding clear and convincing evidence that termination of his parental rights was in Connor's best interests. Further, Randy asserts that contrary to the juvenile court's finding, continued visitation between he and Connor pending

- 1 -

appeal was in Connor's best interests. For the reasons that follow, we affirm the determinations of the juvenile court.

## II. BACKGROUND

### 1. PROCEDURAL HISTORY

Randy is the biological father of Connor, born in April 2020. Christina T. is Connor's biological mother, but as her parental rights are not at issue in the present appeal, she will be discussed only as necessary to provide context. When Connor was born, Christina had open cases with the Nebraska Department of Health and Human Services (DHHS) concerning her three other children, including Rodney D. Christina's three other children were eventually placed with their biological father, who is not Randy. As such, those three children are not involved in this appeal.

In April 2020, DHHS was informed that Christina had just given birth to Connor, that she and her older three children were involved in juvenile court proceedings as a result of Christina's neglect, that she was a methamphetamine user, and that she had used methamphetamine during a previous pregnancy. In addition to this DHHS report, hospital staff discovered drugs in Connor's system after he was born. Connor was immediately removed from Christina's care due to her drug use, her failure to communicate with caseworkers in her ongoing juvenile court cases, and her noncompletion of court orders related to those cases. Additionally, as a result of Connor's positive drug test, a referral was sent to an early intervention team for a follow-up because Connor was deemed to be at a higher risk of developmental delays, neglect, or abuse.

Randy was identified as Connor's father after a paternity acknowledgement was signed on April 13, 2020. Randy's relationship with Christina is not clearly defined by the record, but it appears that although the two were not married, Randy initially hoped to form a family with Christina and Connor. DHHS did not release Connor to Randy's care. Instead, Connor was placed into a foster home on April 23. He has remained in foster care since that time.

In June 2020, Randy indicated that he wanted Connor to reside with him in his home, but as he had never parented a newborn before, he wanted to spend time with Connor first. Case manager Kimberly Cramer informed Randy that Connor had specific feeding needs and that Randy would need to demonstrate he could meet those needs prior to placing Connor with him. Additionally, Randy was instructed to attend Connor's medical appointments. Cramer reported that Randy failed to follow through on these requirements.

On January 15, 2021, the State filed a fifth supplemental petition which, as to Randy, alleged that Connor was a juvenile as defined by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Specifically, the petition alleged that: (1) Connor had been a ward of the state since April 2, 2020; (2) Randy was unable to demonstrate he could care for Connor's specific medical needs; (3) Randy failed to attend any of Connor's medical appointments; (4) Randy failed to consistently attend visits with Connor; (5) Randy failed to provide proper parental care, support, and/or supervision for Connor; (6) Randy failed to provide safe, stable housing; and (7) therefore, Connor was at a risk for harm.

At an adjudication hearing on March 30, 2021, Randy pled no contest to the State's allegations that he was unable to demonstrate that he could care for Connor's specific medical needs, that he failed to provide proper parental care, support, and/or supervision for Connor, and that due to his actions, Connor was at risk for harm. Pursuant to an agreement between Randy and

the State, the remaining allegations were dismissed. At the hearing, the juvenile court found that it would be in Connor's best interests, safety, and welfare to remain in the temporary custody of DHHS. In the meantime, the court ordered Randy to participate in a rehabilitation plan designed to reunify him with Connor. The primary requirements of that rehabilitation plan included maintaining adequate housing, providing proof of stable income, attending Connor's medical appointments, completing a parenting program, and making other reasonable efforts to bring about reunification.

On May 25, 2021, Connor's guardian ad litem filed an ex parte motion to suspend visitation between Connor and Randy until Randy and the visitation agency were properly trained on Connor's feeding disorder. The guardian ad litem alleged that Connor's feeding instructions had recently changed and that all relevant parties had to be educated on Connor's needs before visitations could safely resume. The court subsequently ordered that visitation be suspended pending further order to give Randy and the visitation agency time to attend training and instruction on how to feed Connor. On July 26, 2021, the court also ordered that Randy: (1) continue to participate in nutrition training for liquid and solid foods related to the minor child; (2) demonstrate proficiency with respect to the nutritional needs of Connor; and (3) continue to provide proof of employment to the case manager.

On September 29, 2021, the court entered a review and permanency planning order. The court found that reasonable efforts had been made to reunify Connor with Randy, but those efforts were unsuccessful. The barriers to reunification included Randy's lack of proficiency with respect to meeting Connor's feeding and nutritional needs, Randy's lack of attendance at medical appointments, and Randy's sporadic attendance at visits with Connor. The court found and ordered that the permanency objective as it related to Randy would be reunification with a concurrent plan of adoption. It further ordered that Randy provide confirmation from his employer that during the review period, his employment had prevented him from attending Connor's medical appointments as well as appointments to gain proficiency in feeding Connor.

Another review and permanency planning order was entered on January 13, 2022. Again, reunification efforts were deemed unsuccessful, with the court citing barriers such as the length of time Connor had been in foster care, Randy's inconsistent attendance at visitation, and Randy's inconsistent efforts to learn how to provide Connor with proper medical care. The court ordered that the sole permanency planning objective was now adoption.

On May 19, 2022, the State filed a motion to terminate Randy's parental rights to Connor. Randy denied the allegations contained in the motion and filed a motion to allow visitation pending appeal. The court ordered that it would take up Randy's visitation motion at the conclusion of the termination hearing.

## 2. TERMINATION HEARING

The hearing on the State's motion for termination of parental rights began on January 10, 2023, and continued on January 11 and 25. Jennifer Ludwig, Connor's foster mother, testified that Connor had been placed with her since April 23, 2020. She was familiar with Randy through visitations. Since Connor has been placed with her, Ludwig has had to take him to a significant number of medical appointments. In the beginning, she estimated Connor went to the doctor every other week, but by the time of trial, he was attending appointments every other month. In 2021,

Connor was exhibiting coughing and vomiting after feeds, pulling and digging in his ears, and nasal congestion, which was treated with specialized feeding and eventually a surgery in October 2021. Connor's primary issue, as diagnosed by medical providers, involved his aspiration of food.

Ludwig explained that Connor's medical issues prevent him from consuming normal foods and eating without complications, such that his liquids must be thickened, his solid foods must be cut into small bites, and he must be closely monitored when he is eating and drinking. Ludwig testified that she received specialized training to thicken liquids and prepare solid foods from the feeding team at Children's Hospital and occupational therapist, Gillian Frost. She knew that Randy was ordered to complete the food training as well, and that Connor had to be present for Randy's training session. However, Randy never contacted Ludwig to arrange a time that Connor could attend the training with him.

In addition to his feeding needs, Connor had to wear a helmet for a period of time, which involved visiting a helmet clinic, head scans, and daily at-home care. Connor also experienced breathing issues; he exhibited shortness of breath, labored breathing, and unnatural sucking in and rising of his chest and abdomen. He was prescribed two inhalers and an AeroChamber. One inhaler was to be administered daily, while the other is considered a rescue inhaler to be used only as necessary.

Ludwig explained that she made Randy aware of Connor's upcoming medical appointments through a communication notebook that was sent on visits. She began using the notebook in March or April 2021, but before then, relied on caseworkers to notify Randy of Connor's medical appointments. She stated that, in total, Randy has attended roughly six appointments, one procedure, and three therapies. There were over 20 feeding appointments that Randy did not attend. There were approximately eight appointments regarding Connor's medical helmet that Randy did not attend. Connor also had four swallow studies conducted over the course of 2 years, and Randy only attended one. Randy also attended one appointment with Connor's pulmonologist where an inhaler training and test was conducted. The training consisted of identifying signs and symptoms of when to use an inhaler, which inhaler to use, how many puffs to administer, how long to wait between puffs, and when to contact emergency personnel. Ludwig testified that she passed the test by repeating back what the nurse had taught her, but that Randy was unable to do so.

Randy was scheduled to have visits with Connor one time per week for two hours at a time. When Ludwig prepared Connor for visits with Randy, Connor would hide and cry. After visits with his father, she described Connor as tired and irritable. These visits were supervised by personnel who were trained to monitor Connor and his food consumption. During the summer of 2022, there was a lapse of trained personnel at the visitation agency, so Ludwig offered to supervise visits for Randy. Ludwig testified that Randy failed to consistently attend scheduled visitations with Connor, missing a visitation once a month. When Randy attended visitations, Ludwig observed him play with Connor, but also observed him on his phone and being inattentive to Connor. She estimated that during a 2-hour visit, Randy was on his phone, on and off, for a total of 30 to 45 minutes.

During one visit that Ludwig supervised, Connor left the room for roughly 2 minutes. Randy did not follow Connor, so Ludwig went to look for him, and Randy then followed her. During another visitation, Connor had a bowel movement, and even though Randy was aware of

the circumstances, it took him 30 minutes to change Connor. Despite having Ludwig's contact information, Randy has never contacted Ludwig to check on Connor's well-being or to speak with Connor. Randy has never provided Ludwig any financial support to assist with Connor's care.

Frost, an occupational therapist at Just for Kids, has provided occupational therapy services for Connor since September 2020. During her first assessment of Connor, there were significant feeding concerns, motor concerns, and visual impairment. An individualized service plan was put in place to monitor Connor's development.

Roughly 6 months later, Connor was reassessed. Connor was found to be meeting motor milestones. He also demonstrated improved visual tracking abilities, but feeding continued to be a concern. Following a swallow study, Connor was diagnosed as aspirating thin liquids. It was deemed necessary that Connor's caregivers be trained on the thickening of liquids. Frost assisted Connor's foster family in implementing a specialized diet for Connor. In addition to thickened liquids, the diet required that all solid foods be cut up into very small pieces. It was also imperative that during meals, Connor be supervised by individuals trained in his dietary needs given the risk that he could choke while eating. Such choking, in a worst case scenario, could lead to suffocation.

Frost testified she informed Randy about Connor's medical needs and conducted his initial trainings for both liquid and solid foods. In June 2021, Randy attended a liquid foods training and successfully thickened liquids. Frost conducted a solid food training with Randy in August 2021, but he was not able to gain proficiency in providing solid foods to Connor. Randy could not determine what size of food to give Connor, struggled to supervise Connor during feeding, and did not provide drinks when required. Another food training session was scheduled for September 2021, but Randy did not attend. Almost a year went by before Randy reached out for additional training dates. Three dates were provided to him by Frost, but passed before Randy responded again. At Randy's request, two more possible dates were provided, but he again failed to schedule and attend a second training.

Dr. Heather Thomas, a pediatric pulmonologist, has provided treatment to Connor since August 2021 and continues to see him for periodic appointments. Connor originally went to see Thomas in August 2021 because of aspiration. She recommended thickening his liquids to prevent him from aspirating. In October 2021, he was still experiencing symptoms, so Thomas in conjunction with a team of pediatric specialists removed Connor's adenoids and performed a triple scope procedure. The triple scope procedure allowed the doctors to look down into Connor's lungs, test for aspiration, and look for bacteria. Thomas testified that the results from the triple scope were reassuring. When Connor came back in August 2022, Thomas' recommendation was to continue on the thickened liquids but to also attempt to wean Connor off of them.

Thomas testified that initially inhalers were prescribed to help treat Connor's aspiration, but as of August 2022, Connor no longer needed a regular inhaler. However, she continued to require that his foster family keep the rescue inhaler at home. The purpose of the inhaler was to provide immediate treatment in the event of difficulties with breathing. Thomas testified she would have concerns if a caregiver was unable to verbalize an understanding on how to administer an inhaler to Connor because improper administration would not place the medication where it needs to go. Thomas stated that Connor's primary caregiver should be educated in all his medical issues and needs. Without proper supervision when eating, Connor would be at risk of choking, aspirating, lung scarring, chronic cough, recurrent pneumonia, or in an extreme case, dying.

Cramer was Connor's case manager from the time he was born until February 2022. Cramer testified that she reviewed Randy's court orders and discussed them with him. Cramer confirmed that Randy had maintained safe, stable, and adequate housing and had provided her with proof of employment. However, based on her own observations and provider reports, she noted that Randy was not compliant with the court order requiring that he show proficiency in meeting Connor's feeding needs. Cramer further testified that she could never recommend that Randy's visits move to unsupervised due to his lack of proficiency in understanding and tending to Connor's medical and feeding needs and the inconsistency in his attendance at visits. Randy canceled visits at least once a month, often citing work conflicts. Because of these inconsistencies, she also never recommended increasing Randy's visitation beyond one time per week for 2 hours.

Additionally, while Cramer was the assigned case manager, Randy did not complete a parenting class as ordered by the court. Cramer testified that, in her opinion, Randy did not show himself to be a fit parent because he failed to complete all his court orders, he was not proficient in Connor's feeding needs, and he was not consistent with supervised visitation. As a result, she felt that Randy had failed to make measurable, sustained progress toward reunifying with Connor. Cramer opined that it was in Connor's best interests to have Randy's parental rights terminated.

Holly Twiford became Connor's case manager in March 2022. She testified that Randy did not maintain consistent contact with her. She was aware of Randy's court orders and his history of failing to demonstrate proficiency in Connor's nutritional needs. Twiford testified that, despite having multiple conversations with Randy about this requirement, he never completed training for feeding Connor solid foods prior to the termination hearing.

Twiford never recommended increasing Randy's visitation beyond one time per week because he failed to complete the food training. She noted that Randy's time with Connor could not be extended beyond 2 hours since longer visits would require meals or snacks, and Randy was incapable of providing nutrition correctly. She did note, however, that Randy had recently completed a parenting course.

Twiford could not recommend that Connor return to Randy's care due to Randy's failure to complete necessary trainings, as well as his inconsistent attendance at medical appointments and visitations. She did note that although some missed visitations were caused by a lack of trained supervisors, this need for specialized supervision could have been negated had Randy completed the feeding training. Twiford concluded that, in her opinion, Randy had not shown himself to be a fit parent. Twiford felt that Randy failed to make measurable, sustained progress in correcting the concerns that led to Connor's removal and believed it would be in Connor's best interests to terminate Randy's parental rights.

At the close of the evidence, the juvenile court found by clear and convincing evidence that Connor was a child within the meaning of § 43-292(2), (6), and (7) and that the termination of Randy's parental rights was in Connor's best interests. Based on the evidence presented at the termination hearing, the court also denied Randy's motion for visitation pending appeal. The court held that visitation between Randy and Connor was inconsistent with Connor's best interests, safety, and welfare.

## III. ASSIGNMENTS OF ERROR

Randy alleges that the juvenile court erred in finding clear and convincing evidence that termination of his parental rights was in Connor's best interests. Randy further argues that the juvenile court erred in denying his motion to allow visitation pending his appeal.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *Id.*

## V. ANALYSIS

### 1. TERMINATION OF PARENTAL RIGHTS

The bases for termination of parental rights in Nebraska are codified in § 43-292. Section § 43-292 provides 11 conditions, any one of which can serve as the basis for termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Sir Messiah T.*, 279 Neb. 900, 782 N.W.2d 320 (2010). In order to terminate parental rights, a court must find both requirements are proven by clear and convincing evidence. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

### (a) Statutory Factors

In his brief on appeal, Randy concedes that § 43-292(7) applies in this case, as Connor had been in an out-of-home placement for 15 or more months of the most recent 22 months at the time of trial. After our de novo review of the record, we agree and find that § 43-292(7) has been met. In its order terminating Randy's parental rights to Connor, the juvenile court found that the State had presented clear and convincing evidence to satisfy § 43-292(2), (6), and (7). Because § 43-292 requires that the State prove only one of the enumerated statutory grounds for termination of parental rights, if one condition is met, we need not review the other alleged bases for termination of those rights. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

At the hearing on the State's motion to terminate Randy's parental rights, there was uncontradicted evidence which demonstrated that Connor was removed from his parents' care and placed in a foster home on April 23, 2020, shortly after he was born. He has remained in his foster home since that day. As such, by the time the State filed its second motion to terminate Randy's parental rights in May 2022, Connor had been in out-of-home placement for approximately 24 months. Accordingly, the requirements of § 43-292(7) were met.

Since there is clear and convincing evidence that termination of Randy's parental rights was warranted pursuant to § 43-292(7), we need not address the sufficiency of the evidence to demonstrate that termination was also warranted pursuant to § 43-292(2) and (6). See *In re Interest of Isabel P. et al., supra.*

(b) Best Interests

Having declined to address the sufficiency of the evidence demonstrating that termination was also appropriate pursuant to § 43-292(2) and (6), we treat our discussion of whether termination of Randy's parental rights is in Connor's best interests as though § 43-292(7) is the only statutory basis for termination. When termination is based solely on § 43-292(7), appellate courts must be particularly diligent in their de novo review of whether termination is, in fact, in the child's best interests. *In re Interest of Aaron D.*, 269 Neb. 249, 691 N.W.2d 164 (2005). This is because § 43-292(7) does not require proof of any specific fault by the parent, such as abandonment, neglect, unfitness, or abuse, as other subsections require. *In re Interest of Aaron D., supra.* Thus, proof that termination of parental rights is in the best interests of the child requires clear and convincing evidence of circumstances as compelling and pertinent as those enumerated in the other subsections of § 43-292. *In re Interest of Aaron D., supra.*

A child's best interests are presumed to be served by having a relationship with his or her parent. *In re Interest of Isabel P. et al., supra.* This presumption is overcome only when the State has proved that the parent is unfit. *Id.* In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which has caused, or probably will result in, detriment to a child's well-being. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

The law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). While the best interests analysis is forward-looking, one's history as a parent speaks to one's future as a parent. See *In re Interest of Sir Messiah T.*, 279 Neb. 900, 782 N.W.2d 320 (2010). Further, when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015).

Randy argues that the State failed to present sufficient evidence to prove that termination of his parental rights was in Connor's best interests. He further argues that the progress he made during the pendency of the case and his bond with Connor prove that he is a fit parent.

Contrary to Randy's assertions on appeal, there was clear and convincing evidence presented at the termination hearing to demonstrate that it is in Connor's best interests for Randy's parental rights to be terminated. Due to his medical conditions, Connor needs constant supervision when eating liquid and solid foods. Thomas testified that Connor's primary caregiver must be educated in all his medical issues and needs, which includes knowing how to properly prepare solid foods and monitor his food consumption. At the time of trial, Randy had still not demonstrated that he had become proficient in the solid food training necessary to supervise Connor when he eats. Of greater concern is that Randy has shown little motivation to acquire the necessary skills to administer and supervise Connor's meals. Virtually every witness who testified to Connor's nutritional needs voiced their concerns that Randy had never completed the food training. Without having the training, Connor's health is threatened. Without proper supervision

when eating, Connor is at risk of choking and aspirating. These conditions can lead to lung scarring, chronic cough, recurrent pneumonia, and in an extreme case, death.

The same conclusion can be drawn from Randy's failure to understand how to administer Connor's inhaler. Although Connor is no longer prescribed his regular inhaler, a rescue inhaler remains needed and any adult supervising Connor must know how to administer it. Randy, as of trial, had not been able to verbalize his understanding given by medical providers as to how or when to administer the inhaler to Connor. Randy's inability to administer Connor's inhaler is a deficiency that would prevent administration of necessary and potentially life-saving medicine. Clearly, this inability would be detrimental to Connor's well-being. Thus, the presumption that Connor's best interests are served by having a relationship with Randy is rebutted, as the State's evidence demonstrates that Randy is an unfit parent.

In his brief, Randy argues that while both Cramer and Twiford testified that it was in Connor's best interest to terminate Randy's parental rights because he failed to complete the food training, neither of them assisted Randy in setting up a second food training. Randy asserts that they left it up to him to schedule the appointment and coordinate with the foster family to ensure Connor would be present.

The evidence at trial contradicts Randy's argument. After Randy failed the first solid food training in August 2021, a second training was scheduled for him in September 2021, but he did not attend. Randy then waited almost a year before reaching out for additional training dates. At Randy's request, Frost provided Randy with a total of five dates that Randy could have additional training. However, Randy never responded to Frost's invitation. The potential training dates passed without word from Randy. Moreover, Ludwig was made aware that Connor had to be present for Randy to complete his food training, but Randy never contacted her to arrange a training date. The evidence shows a second food training never occurred because of Randy's failure to effectively communicate with willing parties. Attempts to place the blame elsewhere are not only inaccurate, but they also demonstrate Randy's unfitness. If Randy is incapable of making a couple of phone calls to arrange a training date, we must question how he could ever function as a full-time parent who places the needs of his child above his own.

Randy has also failed to show continued improvement in his parenting skills. The evidence at trial was that Randy missed visitations with Connor approximately once a month. Although some missed visitations were caused by a lack of trained supervisors, the need for supervisors could have been negated if Randy had completed the feeding training. Ludwig also testified that when Randy did attend visitations, he was often inattentive. Randy was frequently on his phone, and Ludwig recounted two distinct visitations where Randy failed to adequately monitor Connor and failed to attend to Connor's needs in a timely manner. Finally, despite having Ludwig's contact information, Randy has never provided financial support for Connor's care or contacted Ludwig to check on Connor or speak with him.

Randy has attended only a small percentage of Connor's medical appointments. When Connor was first placed in Ludwig's care, he was taken to the doctor every other week. At the time of trial, Connor was being taken to the doctor approximately every other month. Despite efforts from Ludwig to keep Randy informed of these appointments, he only attended six appointments, one procedure, and three therapies. There were over 30 medical appointments regarding Connor's feeding concerns or medical helmet that Randy did not attend.

Randy's assertion that his bond with Connor proves him to be a fit parent is unsupported by the evidence. Ludwig testified that, prior to a visit with his father, Connor hides and cries. Ludwig further testified that after visits with Randy, Connor is usually tired and irritable. The evidence at trial did not demonstrate a beneficial relationship between Randy and Connor.

In short, Randy has been unwilling or unable to rehabilitate himself within a reasonable period of time. While he has maintained adequate housing, provided proof of employment, and eventually completed a parenting class, his failures to acquire the skills necessary to properly care for Connor prevent him from being able to establish that he is a fit parent. Cramer and Twiford both testified that Randy failed to make measurable, sustained progress in reunifying with Connor. Neither Cramer nor Twiford ever recommended increasing Randy's visitation beyond one time per week for 2 hours. For all these reasons, we agree with the juvenile court that Connor's best interests require termination of Randy's parental rights.

## 2. MOTION TO CONTINUE VISITATION PENDING APPEAL

Randy also argues that the juvenile court erred in finding that continued visitation between Randy and Connor was not in Connor's best interests. "After parental rights have been terminated, visitation while an appeal is pending would not be in the best interests of children who already have been in limbo for months or years." *In re Interest of J.H. et al.*, 233 Neb. 338, 350, 445 N.W.2d 599, 607 (1989), quoting *In re Interest of Z.D.D. and N.J.D.*, 230 Neb. 236, 430 N.W.2d 552 (1988); see also *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684 N.W.2d 594 (2004) (juvenile court has authority, based upon its continuing jurisdiction over children, to enter orders that are in children's best interests, including order with respect to continued contact with natural parent whose parental rights are being terminated).

In this case, we find no error in the juvenile court's decision to deny Randy visitation with Connor pending this appeal. The juvenile court found that, based upon the evidence presented at the termination hearing, visitation between Randy and Connor was inconsistent with Connor's best interests, safety, and welfare. The evidence presented at the hearing revealed that Connor has been in foster care for essentially all of his life. This extended state of limbo does not support visitation. Our analysis of Connor's best interests applies equally to any inquiry regarding continued visitation following the juvenile court's decision. Randy's failures to comply with the case plan and progress toward reunification provided ample reason to deny further visitation. We find no error in the juvenile court's decision.

## VI. CONCLUSION

Upon our de novo review of the record, we affirm the order of the juvenile court terminating Randy's parental rights to Connor. We also affirm the court's decision to deny Randy any further visitation pending appeal.

AFFIRMED.